UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

| | | |
|---|---|---|
| LUECRETIA DAWN OWENS-EL, et al. | ) ) ) | |
| v. | ) ) | Civil No. JFM-10-3213 |
| SEAN KAPFHAMMER, et al. | ) ) ) ) | |

**MEMORANDUM**

Luecretia Dawn Owens-El ("Owens-El") and her son, Ché Quadaffi Williams-El ("Williams-El"), (collectively "plaintiffs") have brought this civil rights action arising under 42 U.S.C. § 1983 against Lieutenant Sean Kapfhammer of the Baltimore City Police Department. Plaintiffs allege that Kapfhammer and other officers illegally entered and searched Owens-El's apartment, illegally arrested Williams-El, and used excessive force against both plaintiffs. Plaintiffs' second amended complaint asserted four § 1983 claims against Kapfhammer and the other officers. (ECF No. 57.) An order of this court dated August 22, 1012 dismissed all claims against the other officers as well as the civil conspiracy claim against Kapfhammer and the other officers. (ECF No. 87.)

Plaintiffs remaining § 1983 claims against Kapfhammer seek compensatory and punitive damages for individual liability in Counts I and II, respectively, and compensatory damages for supervisory liability in Count IV. Now pending is defendants' motion for summary judgment on these remaining claims. (ECF No. 86.) No hearing is necessary because the issues have been fully briefed. *See* Local Rule 105.6 (D. Md. 2011). For the following reasons, defendants' motion to for summary judgment is granted with respect to the pending claims.

1

I.    **Background**

The following facts are undisputed. On or about December 8, 2006, a team of Baltimore City Police Department officers conducted an operation during which an undercover officer purchased illegal drugs outside of an apartment complex where Owens-El lives. Kapfhammer supervised the operation and watched the transaction from an unmarked vehicle with tinted windows. (Kapfhammer Dep. 23:20–25:19, ECF No. 90-5.) After the controlled buy, Kapfhammer provided descriptions of the two men who had sold the drugs to an arrest team stationed a few blocks away and directed the team to "come in and arrest [both suspects]." (Kapfhammer Dep. 25:20–26:4.)

The arrest team included Officers Githara, Landsman, and Kaikai. Kapfhammer observed Githara apprehend one of the suspects, but the other suspect fled into the apartment complex and was followed by Landsman and Kaikai. (Kapfhammer Dep. 26:6–13; Landsman Dep. 22:20–23:9, ECF No. 90-4.) After Kapfhammer and the undercover officer parked the unmarked car a few blocks away, Kapfhammer returned to the apartment complex. (Kapfhammer Dep. 26:13–20.) Believing the suspect had sought refuge in Owens-El's apartment, Landsman and Kaikai knocked on her door. (Landsman Dep. 23:11–14; 33:4–35:19 (describing the chase and asserting that he never lost sight of the suspect).) Owens-El answered the door and explained that no one had entered or left her apartment. (Owens-El Dep. 89:4–14, ECF No. 90-7.)

At this point, the parties' stories diverge. Plaintiffs allege that Landsman and Kaikai, who did not have a warrant, forced their way inside her apartment by pushing the door open, knocking Owens-El to the ground, and stepping on her shins. (Owens-El Dep. 97:8–98:11.)

Plaintiffs also claim that Kapfhammer entered Owens-El's apartment soon after Landsman and Kaikai entered (Owens-El Dep. 100:11–102:2) and that he searched Williams-El's room (Owens-El Dep. 143:17–18). Kapfhammer, however, maintains that he never entered the apartment and that he arrived when Williams-El was being escorted out in handcuffs. (Kapfhammer Dep. 26:20–27:3.)

Plaintiffs allege that Landsman and Kaikai burst into Williams-El's room and threw him to the ground. (Williams-El Dep. 67:9–19.) Although the timing is not clear from the record, Williams-El was eventually identified by both Kapfhammer and the undercover officer, arrested, and taken to the police station with another suspect. (Kapfhammer Dep. 27:6–28:4.) Williams-El was charged with various drug crimes, but those charges were dropped. (Second Am. Compl. ¶18, ECF No. 57.)

Asserting claims under § 1983 for unlawful entry, search, arrest, and excessive force, plaintiffs sued Kapfhammer, Landsman, Kaikai, and Githara. (Second Am. Compl.) Kapfhammer is the only remaining defendant. *See* ECF No. 87 (granting defendants' partial motion to dismiss).

## II.    Legal Standard

A court may grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *see also Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (recognizing that trial judges have "an affirmative obligation" to prevent factually unsupported claims and defenses

from proceeding to trial). Nevertheless, in determining whether there is a genuine issue of material fact, the court must view the facts, and all reasonable inferences to be drawn from them, in the light most favorable to the non-moving party. *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987). Hearsay statements or conclusory statements with no evidentiary basis cannot support or defeat a motion for summary judgment. *See Greensboro Prof'l Fire Fighters Ass'n, Local 3157 v. City of Greensboro*, 64 F.3d 962, 967 (4th Cir. 1995).

### III.     Analysis

Plaintiffs sue Kapfhammer both in his individual capacity (Counts I and II) and in his role as a supervising officer (Count IV).[1] Kapfhammer argues he is entitled to summary judgment on all of plaintiffs' claims.

#### A. Individual Capacity Claims

In order to prevail on their individual capacity claims, plaintiffs must show that Kapfhammer "personally caused the deprivation of [their] federal rights." *Roberts v. Prince George's Ctny.*, 157 F. Supp. 2d 607, 609 (D. Md. 2001) (quoting *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)). As an initial matter, therefore, the court must identify which claims apply to Kapfhammer personally. Plaintiffs have conceded that neither Owens-El nor Williams-El has an excessive force claim against Kapfhammer. (Defs' Owens-El Dep. 105:12–14, ECF No. 86-5 (admitting that Kapfhammer did not make physical contact with her); Williams-El Dep. 67:11–21, ECF No. 90-8 (stating that the officer who threw him to the ground in his bedroom was

---

[1] Although plaintiffs purport to sue Kapfhammer in both his personal and official capacity (Second. Am. Compl. ¶ 7), they make no allegations that the Baltimore City Police Department engaged in a policy or practice of violating citizens' Fourth Amendment rights. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (explaining that "in an official-capacity suit the [government] entity's 'policy or custom' must have played a part in the violation of federal law" while personal liability under § 1983 requires only a showing that an official acting under color of state law caused a deprivation of a federal right). Accordingly, the court will only consider plaintiffs' personal liability claims against Kapfhammer, both as an individual and as a supervisor.

4

black[2]).) The parties dispute, however, whether Kapfhammer was ever present in Owens-El's apartment, a fact required to find him liable for the illegal entry, search, and arrest[3] claims.

### 1. Plaintiffs' Failure to Identify Kapfhammer Not Fatal to Their Claims

The parties' briefing centers on Kapfhammer's assertion that plaintiffs were unable to identify him during discovery. Kapfhammer contends that he is entitled to summary judgment on the individual liability claims because he was not present when the allegedly unlawful entry, search, arrest, and uses of force took place and, therefore, cannot be personally responsible for these actions. His argument rests primarily on plaintiffs' failure to identify him in photo arrays. The photos were taken around the same time as the incident but were not shown to plaintiffs until their depositions nearly six years later.

Although Kapfhammer denies ever being present in Owens-El's apartment, he admits that he supervised the undercover drug operation that ultimately led to Williams-El's arrest. Owens-El alleges that Kapfhammer was the fourth and last officer who entered her apartment and that she knows he was present because he identified himself to her by name when she asked who was in charge. (Owens-El. Dep. 101:18–20; 141:19–142:14.) She also alleges that she was alone with Kapfhammer when he searched Williams-El's room. (Owens-El. Dep. 143:17–144:12.) Williams-El asserts that he first saw Kapfhammer in the hallway of the apartment, outside of his bedroom. (Williams-El Dep. 162:2–15.)

---

[2] Kapfhammer is Caucasian. (Kapfhammer Aff. ¶ 8.)

[3] It is not clear from the record when exactly Williams-El was arrested. Plaintiffs' opposition suggests that "[i]t is also undisputed that Kapfhammer arrived on scene when Williams-El was under arrest" and that "at the time Defendant Kapfhammer saw Plaintiff Williams-El under arrest, he was aware or should have been aware that his subordinates had arrested the wrong person." (Pls.' Opp. 12, ECF No. 90.) In her deposition, however, Owens-El alleges that Williams-El was "still uncuffed" in the hallway of the apartment when she watched Kapfhammer search Williams-El's room. (Owens-El. Dep. 144:10–19.) Similarly, Williams-El testified that he had not yet been placed under arrest when he heard Kapfhammer tell his mother that Kapfhammer was "in charge." (Williams-El Dep. 88:17–90:9.)

Given plaintiffs' detailed allegations and Kapfhammer's undisputed involvement in the undercover operation and presence at the apartment complex, plaintiffs' inability to identify Kapfhammer in photo arrays shown to them nearly six years after the incident is not dispositive of his lack of liability. Plaintiffs' identification of Kapfhammer as a defendant, however, cannot alone cause plaintiffs' claims to withstand summary judgment. The court looks, therefore, to Kapfhammer's qualified immunity defense.

### 2. Kapfhammer's Qualified Immunity Defense

Kapfhammer argues, alternatively, that he is entitled to immunity because plaintiffs have failed to establish that he acted with malice. An officer's subjective intent, however, is irrelevant under the Fourth Amendment. *See Graham v. Connor*, 490 U.S. 386, 399 (1989) ("The Fourth Amendment inquiry is one of 'objective reasonableness' under the circumstances, and subjective concepts like 'malice' and 'sadism' have no proper place in that inquiry."). Although Kapfhammer is correct that an officer's lack of malice is required under the Maryland doctrine of public official immunity, *see Shoemaker v. Smith*, 725 A.2d 549, 558 (Md. 1999) ("Unlike the judicially-fashioned purely objective tests for immunity under § 1983, the General Assembly has made clear that State personnel do *not* enjoy immunity under [the State Tort Claims Act] if they act with malice."), that doctrine does not apply to U.S. constitutional claims like those arising under the Fourth Amendment in the instant case, *see Graham*, 490 U.S. at 399.[4]

Recognizing that Kapfhammer may have intended to seek the protection of federal qualified immunity, plaintiffs contend he has failed to argue that the facts plaintiffs allege do not

---

[4] Although evil motive is irrelevant to the immunity analysis under § 1983, it is relevant to the issue of punitive damages raised in plaintiffs' Count II. Punitive damages are recoverable under § 1983 when a plaintiff who is entitled to compensatory damages can prove the defendant's conduct was "motivated by evil motive or intent" or "involves reckless or callous indifference to the federally protected rights of others." *Dent v. Montgomery Cnty. Police Dep't*, 745 F. Supp. 2d 648, 662 (D. Md. 2010) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)).

constitute a constitutional violation.  Kapfhammer is entitled to qualified immunity, however, if this court finds, based on the facts presented in the light most favorable to plaintiffs, that no reasonable jury could find that he committed a constitutional violation.  *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (reiterating that an officer is entitled to qualified immunity if the court finds either that the officer's conduct did not violate a constitutional right or that the right in question was not clearly established and holding that the court may consider either issue first).

This court now considers whether a constitutional violation occurred in this case.  The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and provides that "no warrants shall issue, but upon probable cause."  U.S. Const. amend. IV.  The warrant requirement, however, is subject to a number of exceptions.  One such exception exists when law enforcement officers are in hot pursuit of a fleeing suspect.  *See United States v. Santana*, 427 U.S. 38, 42-43 (1976).  Under another well-established exception, police may enter a residence without a warrant in order "to prevent the imminent destruction of evidence," such as drugs that could easily be flushed down the toilet or otherwise destroyed.  *See Brigham City v. Stuart*, 547 U.S. 398, 403 (2006).

In determining whether an exception applies, courts must be mindful that the "touchstone" of the Fourth Amendment is reasonableness, "which is measured in objective terms by examining the totality of the circumstances."  *Ohio v. Robinette*, 519 U.S. 33, 34 (1996).  As the Supreme Court has noted, "[t]he calculus of reasonableness must embody allowance for the

fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Graham*, 490 U.S. at 396-97.

Both when officers have a warrant and when they act under the belief that an exception to the warrant requirement applies, the Supreme Court and the Fourth Circuit have recognized that "reasonable mistakes made by law enforcement officers d[o] not constitute Fourth Amendment violations." *Henry v. Purnell*, 652 F.3d 524, 547 (4th Cir. 2011) (Shedd, J., dissenting) (citing *Illinois v. Rodriguez*, 497 U.S. 177 (1990); *Maryland v. Garrison*, 480 U.S. 79 (1987); *Hill v. California*, 401 U.S. 797 (1971); *Mazuz v. Maryland*, 442 F.3d 217 (4th Cir. 2006), *abrogated on other grounds by Pearson*, 555 U.S. 223; *United States v. Patterson*, 278 F.3d 315 (4th Cir. 2002)). To the extent that probable cause for a search or seizure is "based on reasonable but mistaken assumptions," the person searched or seized "has not necessarily been the victim of a constitutional violation." *Herring v. United States*, 555 U.S. 135,139 (2009).

In *Mazuz*, the Fourth Circuit found no Fourth Amendment violation when a police officer mistakenly entered the wrong college dorm room during a multi-room drug raid due to "an honest mistake based on [the officer's] observation and perception of the room number as the raid unfolded." 442 F.3d at 226. In the seizure context, "officers who mistakenly arrest the wrong person are immune from § 1983 liability unless they act in an objectively unreasonable manner in the circumstances, as for example, in failing to investigate readily available exculpatory evidence." *Brown v. Wiita*, 7 Fed. App'x 275, 279 (4th Cir. 2001); *see also Schultz v. Braga*, 455 F.3d 470 (4th Cir. 2006).[5]

---

[5] In *Schultz*, the Fourth Circuit reasoned that an agent and his colleagues
    reasonably believed that the occupants of the vehicle were [the suspect] and his girlfriend, and
    they had probable cause to stop the car and seize the occupants. Accordingly, our evaluation of
    [the agent's] use of deadly force must be viewed from this perspective, without regard to the fact

The parties dispute whether Williams-El was actually one of the individuals observed by Kapfhammer and the undercover officer during the controlled buy.  Plaintiffs maintain Williams-El's innocence.  The relevant factual question in this case, however, is not whether Williams-El was actually involved in the drug transaction—a fact that is not clearly established in the record.  (*See* Williams-El Dep. 163:11–14 (stating that he did not know why the charges were dropped).)  The relevant question is whether it was reasonable for Kapfhammer and the other officers to have believed that the fleeing suspect had sought refuge in Owens-El's apartment.

Plaintiffs allege that "because of the obstructed view and the multiple units within the Apartment Complex, it would have been impossible for the officers to identify which, if any, apartment unit the suspect entered."  (Second Am. Compl. ¶ 3.)  Kapfhammer asserts that, because he was not yet at the scene, he did not observe where Williams-El went but was told by the other officers that Williams-El had fled to Owens-El's apartment.  (Kapfhammer Aff. ¶ 6.)  Landsman, who was involved in the chase, testified that he never lost sight of Williams-El until the door of the apartment closed behind Williams-El.  (Landsman Dep. 34:17–14.)

Plaintiffs have not offered any evidence to (i) support their allegation that it would have been impossible for the officers to have seen the specific apartment entered by the suspect or (ii) refute the officers' testimony concerning what they observed prior to entering Owens-El's apartment.  Although Owens-El told the officers before they entered her apartment that no one had gone in or out in the past three hours, the officers were under no obligation to believe her. *See Brown*, 7 Fed. App'x at 280 (That the suspect "protested his innocence or that [the officer] could have waited to receive the Department of Motor Vehicles photograph does not detract

---

that the occupants of the vehicle were later discovered to be an innocent couple tragically mistaken to be the suspect . . . and his girlfriend . . . .
455 F.3d. at 478.

from the reasonableness of [the officer's] belief that he was arresting the correct person."); *see also Hill*, 401 U.S. at 803 (noting that "aliases and false identifications are not uncommon").

Assuming that Kapfhammer entered Owens-El's apartment along with or soon after the other officers (Owens-El. Dep. 100:11-102:2), nothing in the record suggests that the actions taken by Kapfhammer and the other officers in making the entry were rash, unreasonable, or anything more than "an honest mistake based on [the officers'] observation[s] and perception[s]," *see Mazuz*, 442 F.3d at 226, made under "circumstances that [we]re tense, uncertain, and rapidly evolving," *see Graham*, 490 U.S. at 396-97. Moreover, plaintiffs do not allege that the officers acted unreasonably in targeting Owens-El's apartment. On the contrary, when asked during her deposition if she felt the officers "were trying to enforce the law, they just got the wrong house," Owens-El agreed. (Defs' Owens-El Dep. 285:6-8, ECF No. 86-5.)

Because the officers who entered Owens-El's apartment and arrested Williams-El had no warrant, the validity of the entry, search, and arrest turn on whether an exception to the warrant requirement applies. It is clear that the officers had probable cause to arrest the suspects who sold drugs to the undercover officer. One suspect fled the scene, forcing the officers to follow in hot pursuit. The exigency exceptions permitted the officers to enter the residence they reasonably believed the fleeing suspect to have entered in order to prevent the destruction of evidence. The same exigency exception to the warrant requirement allowed the officers to arrest the suspect and sweep the apartment for contraband. *See Mazuz*, 442 F.3d at 231 ("[I]n this circumstance once [the officer] entered Mazuz's room he was 'entitled to do what the law would have allowed [him] to do' if he had entered the correct room.") (quoting *Hill*, 401 U.S. at 804). A reasonable mistake as to the suspect's identity does not render the officers' warrantless entry,

10

arrest, and search illegal. *See Hill*, 401 U.S. at 802 ("When the police have probable cause to arrest one party, and when they reasonably mistake a second party for the first party, then the arrest of the second party is a valid arrest."). Accordingly, taking the evidence in the light most favorable to plaintiffs and assuming the officers simply "got the wrong house," the court finds that no reasonable jury could conclude that Kapfhammer committed a constitutional violation.

### B. Supervisory Claims

Plaintiffs claim Kapfhammer has additional liability because he supervised the undercover operation and arrest team. Three elements are necessary to establish supervisory liability under 42 U.S.C. § 1983:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices;" and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).

Kapfhammer argues that he is entitled to summary judgment on plaintiffs' supervisory claims because he had no knowledge of his subordinates' alleged misconduct. This court, however, finds that the reasonable mistake of identity made by the officers in hot pursuit of a suspect did not pose a "'pervasive and unreasonable risk' of constitutional injury" to Owens-El and Williams-El. Accordingly, there is no constitutional violation for which Kapfhammer can be held liable as a supervisor.

### IV. Conclusion

For the foregoing reasons, defendants' motion for summary judgment (ECF No. 86) is hereby GRANTED with respect to all claims against Kapfhammer. This case is now CLOSED. A separate order follows.

March 8, 2013                                          /s/
Date                                                         J. Frederick Motz
                                                                 United States District Judge